Raymond J. DONOVAN, Secretary of
Labor, Plaintiff,

v.

Loran W. ROBBINS, Robert E. Schlieve, Thomas O'Malley, R.V. Pulliam, Robert Baker, Earl L. Jennings, Jr., Earl N. Hoekenga, Andrew G. Massa, Roy L. Williams, William Presser, Jackie Presser, Frank E. Fitzsimmons, Joseph W. Morgan, John F. Spickerman, Thomas J. Duffey, Jack A. Sheetz, and John E. Dwyer, Defendants.

Raymond J. DONOVAN, Secretary of
Labor, Plaintiff,

v.

Allen M. DORFMAN, Rose Dorfman, Myer Breen, Sol C. Schwartz, Amalgamated Insurance Agency Services, Inc., Federal Computer Systems, Inc., Health Plan Consultants Service, Inc., Prescription Plan, Inc., Robert Baker, Earl L. Jennings, Jr., Howard McDougall, Thomas F. O'Malley, Rudy V. Pulliam, Sr., Loran W. Robbins, Marion M. Winstead, Harold J. Yates, John E. Dwyer, and Central States, Southeast and Southwest Areas Health and Welfare Fund, Defendants.

Nos. 78 C 4075, 82 C 7951.

United States District Court,
N.D. Illinois, E.D.

Jan. 18, 1983.

David H. Feldman, Richard O. Patterson, U.S. Dept. of Labor, Washington, D.C., for plaintiff.

Edward L. Foote, Winston & Strawn, Michael J. Rovell, Albert E. Jenner, Jr., Jenner & Block, Jeffrey N. Cole, James L. Coghlan, William J. Nellis, Mairen C. Kelly, Coghlan, Joyce, Nellis & Kelly, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

This matter is before the court on the motion of Raymond J. Donovan, the Secretary of Labor (the "Secretary"), for a preliminary injunction. A four-day hearing was held on the motion during which seven witnesses testified and over one hundred exhibits were submitted. After hearing oral argument on the motion and reviewing all of the evidence and briefs submitted, the court concludes that, on the basis of the current record, the preliminary injunction sought is not warranted and, accordingly, the Secretary's motion is denied.

With respect to its disposition of the Secretary's motion for a preliminary injunction, the court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

1. The controversy originated on October 16, 1978, when the Secretary filed his initial complaint against the Trustees and the Executive Director of the Central States, Southeast and Southwest Areas Health and Welfare Fund (the "Fund") in *Marshall v. Robbins,* 78 C 4075 ("78 C 4075"). The Fund and Amalgamated Insurance Agency Services, Inc. ("Amalgamated") were permitted to intervene as defendants. The Secretary moved for temporary and preliminary injunctive relief to enjoin the Fund from entering into a claims adjustment agreement with Amalgamated. The case was assigned to Judge Thomas R. McMillen who held a five-day hearing beginning on October 25, 1978. The Secretary's motion for preliminary injunction was denied at the conclusion of the hearing, as was the Secretary's motion for an injunction pending appeal. The Secretary did not pursue an appeal of those rulings. On June 25, 1979, the court granted summary judgment in defendants' favor on most of the Secretary's claims. On June 24, 1980, that decision was reversed and the case remanded in an unpublished opinion by the Court of Appeals for the Seventh Circuit (the "Seventh Circuit"). On remand, the case was assigned to Judge Joel M. Flaum and the parties proceeded with further discovery.

2. On December 29, 1982, the Secretary filed a new action, *Donovan v. Dorfman,* 82 C 7951 ("82 C 7951"), which was assigned to Judge Nicholas J. Bua. In addition, the Secretary filed a motion for a finding that case 82 C 7951 is related to 78 C 4075 pursuant to Local Rule 2.31. On that same day, the Secretary also made an application for an *ex parte* temporary restraining order in cases 78 C 4075 and 82 C 7951. The Fund joined the Secretary on the motion. The *ex parte* application was heard by Judge Bua, who was the designated emergency judge in Judge Flaum's absence from the court. Judge Bua granted the Secretary's application for a temporary restraining order and entered an injunctive order submitted by the Secretary. The order required the appointment of a receiver and the law firm of Scariano, Kula & Associates, Ltd. (the "Receiver") was appointed.

3. On December 30, 1982, the defendants in 82 C 7951 were granted a hearing before Judge Bua at which they moved to dissolve the receivership and other injunctive relief granted in the temporary restraining order. After argument of counsel, Judge Bua denied the defendants' motion to vacate the temporary restraining order. Judge Bua also appointed Kevin M. Forde to be the Receiver's attorney.

4. Both cases were set for a status hearing before Judge Flaum on January 3, 1983, at 10:30 a.m., at which time the defendants moved to dissolve the temporary restraining order. The status continued until the same afternoon when the Secretary's counsel could be present. At that time, the court determined that the matter should proceed on the Secretary's motion for preliminary

injunction which had been filed in both cases on December 29, 1982. The Fund also joined in the motion. The court also granted the Secretary's motion for a finding of relatedness.

5. A hearing on the Secretary's motion for preliminary injunction began on the morning of January 4, 1983, and continued until the afternoon of January 7, 1983. After extensive argument on the Secretary's motion for an extension of the temporary restraining order, the court extended the order to remain in effect until 2:00 p.m. on January 18, 1983. The court also directed the parties to submit proposed findings of fact and conclusions of law on the motion for preliminary injunction by 12:00 noon on January 12, 1983. Oral argument on the motion was held at 3:00 p.m. on that day.

6. The Fund is a trust formed pursuant to an Agreement and Declaration of Trust dated March 14, 1950, as amended, and has its principal place of business in Chicago, Illinois. The Fund was established and is maintained by employers and employee organizations engaged in commerce for the purpose of providing medical, hospital care, dental, vision, prescription and related medical benefits to approximately 500,000 eligible participants and beneficiaries who reside in all fifty states. The Fund's assets are held in trust.

7. The Fund is administered from Chicago, Illinois by a Board of Trustees (the "Trustees") composed of eight trustees. The same trustees also comprise the Board of Trustees of and administer the Central States, Southeast and Southwest Areas Pension Fund (the "Pension Fund").

8. From May 17, 1977, until December 20, 1982, Thomas F. O'Malley ("O'Malley") served as a trustee of both the Fund and the Pension Fund.

9. Commencing February 1, 1976, the Fund became self-funded with respect to the payment of benefit claims submitted by its participants and beneficiaries. These health and welfare benefits are paid from funds contributed by employers as required by the applicable collective bargaining agreements.

10. Prior to February 1, 1976, the Fund entered into a contract with Amalgamated under the terms of which Amalgamated provided claims processing services directly to the Fund.

11. A new three year claims processing agreement between the Fund and Amalgamated (the "1979 Contract") which had a commencement date of March 1, 1979, was executed on November 8, 1978.

12. Myer Breen ("Breen") is the president and a director of Amalgamated and has served in these offices for many years. He has been associated with Amalgamated for nearly twenty-seven years.

13. Sol C. Schwartz ("Schwartz") was the secretary and a director of Amalgamated for many years. He resigned from these positions on January 12, 1983.

14. David Dorfman, Allen M. Dorfman's son, is the third director of Amalgamated and has served in this office for several years.

15. Allen M. Dorfman ("Dorfman") owns, and for many years has owned, 50% of the issued and outstanding stock of Amalgamated. He holds no corporate office in Amalgamated and has no corporate title.

16. Rose Dorfman, Dorfman's mother, owns, and for many years has owned, 50% of the issued and outstanding stock of Amalgamated and is the assistant secretary of Amalgamated.

17. Health Plan Consultants Service, Inc. ("Health Plan Consultants") processes all claims relating to dental benefits submitted on behalf of the Fund's participants and beneficiaries. Schwartz is the president and a director of Health Plan Consultants; Jay Dorfman is the vice-president; Breen is the secretary and a director; and David Dorfman is the treasurer and the remaining director. No evidence was submitted concerning the stock ownership of Health Plan Consultants.

18. Prescription Plan, Inc. ("Prescription Plan") was created to process all claims relating to prescription and drug benefits

submitted on behalf of the Fund's participants and beneficiaries. The issued and outstanding stock of Prescription Plan is owned as follows: James Dorfman, 16%; David Dorfman, 16%; Kim Dorfman Glefke, 16%; Michael Dorfman, 16%; Andrew Dorfman, 10%; Marla Dorfman, 10%; Brian Dorfman, 10%; Charles Schwartz, Schwartz's son, 4%; and Breen, 2%. Breen is the president and a director of Prescription Plan; David Dorfman is the secretary and a director; and Schwartz is the treasurer and the remaining director.

19. Federal Computer Systems, Inc. ("Federal Computer") owns or leases computer equipment used to process the claims for Amalgamated, Health Plan Consultants and Prescription Plan. Federal Computer controls the software that enables Amalgamated, Health Plan Consultants and Prescription Plan to process all benefit claims submitted by the Fund's participants and beneficiaries. The issued and outstanding stock of Federal Computer is owned as follows: Dorfman, 31%; Jay Dorfman, 20%; Michael Dorfman, James Dorfman, Kim Dorfman Glefke, David Dorfman, Andrew Dorfman, Marla Dorfman and Brian Dorfman, 7% each. Breen is the president and a director of Federal Computer; James Dorfman is the vice-president and assistant secretary; David Dorfman is the secretary and a director; Schwartz is the treasurer and the remaining director.

20. According to the Blomquist Report, the software package developed and used by Amalgamated and Federal Computer to process claims is tailor-made for the needs of the Fund. The Blomquist Report, which was prepared for the Fund on October 12, 1981, is an analysis of the bids the Fund received in 1981 for claims services.

21. Dorfman has been associated with Amalgamated, Federal Computer, Health Plan Consultants and Prescription Plan since the inception of these respective entities. For the fiscal year ending October 31, 1983, Dorfman's projected salary, exclusive of dividends, from Amalgamated, Federal Computer and Health Plan Consultants totals $416,000.00. The amount from Amalgamated alone exceeds $300,000.00.

22. Dorfman is consulted with and provides input for major management decisions at Amalgamated, including significant changes with respect to marketing, installation of equipment, expansion, corporate structure, business direction, future planning and big expenditures. Dorfman does not participate in the day-to-day operation of Amalgamated.

23. Amalgamated's total income is derived from compensation paid by the Fund for the processing of claims by Amalgamated on behalf of the Fund's participants and beneficiaries. Since February 1976 the Fund has paid Amalgamated approximately $56,000,000.00. In 1982 the Fund paid Amalgamated approximately $10,000,000.00.

24. In 1982 Amalgamated, Health Plan Consultants and Prescription Plan processed an average of 141,426 claims per month. Approximately 100,000 more claims were paid in 1982 than in 1981. When medical claims are received, Amalgamated reviews them to determine if the charges are fair and reasonable using adjustment standards jointly established by the Fund and Amalgamated based on customary charts in the industry. The Fund makes final determinations on any contested payments.

25. The 1979 Contract established a monthly fee to be paid to Amalgamated in exchange for "all services and materials requested by the [Fund] in the processing, investigation, adjudication and payment of claims for all benefits provided by the [Fund] to its participants and described in the present Plan [Fund] Document and as described in the present [Fund] Document ... as from time to time amended during the term of [the 1979 Contract]."

26. In the summer of 1978 Breen was aware that a new National Master Freight Agreement was being negotiated between the trucking industry and the Teamsters' Union. Representatives of Amalgamated were kept abreast of those negotiations.

27. In addition to the monthly fee provided for in the 1979 Contract and paid by the Fund to Amalgamated, from June 1979

to June 1980 Amalgamated invoiced the Fund for a total of $624,068.64 for processing prescription drug claims on an agreed upon cost-plus basis. Amalgamated received payments from the Fund in that amount.

28. In addition to the monthly fee provided for in the 1979 Contract and paid by the Fund to Amalgamated, during the months of August, September and October 1979 and January and February 1980 Amalgamated invoiced the Fund for a total of $506,333.60 for overtime expenses incurred in processing a backlog of dental claims on behalf of the Fund. The backlog existed, as the Fund admitted, because the Fund failed to define dental benefits in a timely manner. Amalgamated received payments from the Fund for the invoiced amount.

29. On December 19, 1979, Dorfman, Breen, Schwartz and Marion H. Miller, Amalgamated's director of operations, attended a meeting of the Trustees. The minutes of that meeting indicate that the Trustees were told that Amalgamated has been operating at a deficit for several months and that Amalgamated could not provide the same service relative to the increased volume of claims without a change in its service fee.

30. Following the December 19, 1979, meeting and continuing until May 20, 1980, attorneys representing the Fund and Amalgamated entered into lengthy negotiations with respect to the claims processing services being rendered by Amalgamated and the fees being paid for these services by the Fund. Attorneys for the Fund and Amalgamated agreed that the additional costs and expenses incurred by Amalgamated were the result of the new National Master Freight Agreement which provided for additional benefits. The Fund's accountants and Amalgamated's outside certified public accountants examined the books and records of Amalgamated and concluded separately that the additional cost to Amalgamated was approximately $0.89 per participant.

31. Amalgamated's financial statements are kept on a cash basis. Amalgamated's records indicate that from November 1, 1979 to October 31, 1980, Amalgamated realized a net income from operations in the amount of $1,042,600.00. From May 1, 1980 to October 31, 1980 the net income from operations was $758,836.00.

32. By letter dated March 6, 1980, Breen submitted data to the Fund representing that Amalgamated required an increase of $0.82 per participant if it were to process the increased number of claims.

33. At the April 17, 1980, meeting of the Trustees, a motion to accept Amalgamated's proposal to, among other things, increase the monthly fee paid by the Fund to Amalgamated was defeated by a vote of four to three.

34. On April 17, 1980, Amalgamated terminated approximately twenty employees. The stated reason for the terminations was that the employees had been hired in response to an expanded benefit program at the Fund and that Amalgamated was not receiving proper compensation from the Fund to permit Amalgamated to pay these employees. A copy of the termination notice given to the Amalgamated employees was also given to the Fund.

35. On May 6, 1980, Dorfman, David Dorfman, Breen, Schwartz and Albert E. Jenner, Jr. ("Jenner"), an attorney for Amalgamated, attended a meeting of the Trustees to discuss the backlog of claims and additional compensation for Amalgamated.

36. On May 20, 1980, Dorfman, David Dorfman, Breen, Schwartz, Jenner and Morris Weiser, an accountant for Amalgamated, attended a meeting of the Trustees. At that meeting, the Trustees, with two trustees dissenting, authorized and approved an amendment to the 1979 Contract which, among other things, increased the monthly service fee to be paid by the Fund to Amalgamated by $0.898 per participant, effective June 1, 1980. At that time there were approximately 180,000 or 190,000 participants in the Fund. The amendment further authorized a retroactive increase for the months of February, March, April and May 1980 (the "Retroactive Increase").

37. By letter to the Trustees dated May 20, 1980, Amalgamated, through Breen, agreed to indemnify the Fund and the Trustees up to the amount of $197,147.90 for any judgment that might be entered against them on the ground that payments for overtime expenses violated the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001–1461 (1976 & Supp. IV 1980). Amalgamated also agreed to indemnify the Fund and the Trustees for any payments made to Amalgamated pursuant to the modified contract that are adjudicated to exceed the actual cost of processing within the agreed upon time span.

38. On May 21, 1980, the Fund paid Amalgamated the Retroactive Increase in the amount of $660,928.00.

39. The modification to the 1979 Contract executed in May 1980 (the "1980 Modification") established time frames (the turnaround time) within which Amalgamated was obligated to process claims. In a letter to the Trustees dated February 27, 1980, James G. Walsh, Jr. and Russell N. Luplow, attorneys for the Fund, stated that "the tightness of the time limits imposed on Amalgamated is a key ingredient in the ultimate legality and prudence of [the] modification", and concluded that the time limits had "little, if any, legal significance". The time limits set forth in the appendix to the 1980 Modification were actually equal to or longer than the time frames within which Amalgamated was actually performing when it was processing the additional claims attributable to the new National Master Freight Agreement. The appendix to the 1980 Modification setting forth these time frame obligations bears the notation "Amalgamated will adhere to these time frames as soon as it can get back to its previous schedule".

40. Amalgamated submitted a bid in August 1981 (the "1981 Bid") to perform all claims processing services for the Fund for a fee less than that set by the 1980 Modification. Amalgamated currently performs all claims processing services at the rate which was submitted in the 1981 Bid.

41. In addition to their ownership interest in Amalgamated, Federal Computer, Health Plan Consultants and Prescription Plan, Dorfman and members of his family have substantial or total ownership interest in a number of affiliated entities (the "Affiliated Entities"). The Affiliated Entities include Union Insurance Agency of Illinois ("Union Insurance Illinois"), a partnership comprised of Dorfman and Rose Dorfman; Rivershire Development Company ("Rivershire"); Meridian Health Administrators, Inc. ("Meridian Health") and Meridian Agency, Inc. ("Meridian Agency"), in both of which the four children of Dorfman and the three children of Jay Dorfman own 98% of the stock; Federal Service Company, Ltd. ("Federal Service"), a limited partnership in which Breen is the general partner and trusts for the Dorfman and Jay Dorfman children are limited partners; Southwest Insurance Agencies ("Southwest"), a partnership composed of Dorfman, Rose Dorfman, and Schwartz; and Union Insurance Agency, Inc. ("Union Insurance Inc.").

42. Over a number of years Amalgamated made various transfers to the Affiliated Entities. Exhibit I–A to "Amalgamated's Statement of Assets and Liabilities—Cash Basis" for the year ending October 31, 1981 ("Amalgamated's 1981 Financial Statement") reflects the unpaid balance of these transfers, including transfers to Federal Computer and Prescription Plan, as follows:

| | |
|---|---|
| Union Insurance Illinois | $ 1,609,938 |
| Rivershire | 236,276 |
| Federal Computer | 76,059 |
| Meridian Health | 26,739 |
| Federal Service | 26,472 |
| Prescription Plan | 15,259 |
| Meridian Agency | 5,000 |
| Southwest | 3,164 |
| Union Insurance Inc. | 1,200 |
| Total | $ 2,000,107 |

Notations on the check stubs and entries in the accounting records of Amalgamated state that these transfers were "loans." It does not appear that any notes or other evidence of indebtedness were ever executed or maintained with respect to these loans. The loans have no written interest

rate or repayment terms. These loans were made on an "as needed" basis.

43. Over a number of years Amalgamated made various transfers of money to a number of individuals. Amalgamated's 1981 Financial Statement reflects the unpaid balance of these transfers as follows:

| | | |
|---|---|---|
| Dorfman | $ | 832,223 |
| Schwartz | | 119,889 |
| David Dorfman | | 116,550 |
| James Dorfman | | 32,976 |
| KRD Trust (a trust for Kim | | |
| Dorfman Glefke) | | 17,400 |
| Jay Dorfman | | 14,026 |
| Rose Dorfman | | 6,334 |
| David and Kim Glefke | | 3,200 |
| Michael Dorfman | | 2,508 |
| | | |
| Total | $ | 1,145,106 |

Notations on the check stubs and entries in the accounting records of Amalgamated state that these transfers were "loans." It does not appear that any notes or other evidences of indebtedness were ever executed or maintained with respect to these loans. The loans have no written interest rate or repayment term.

44. The Receiver has reviewed the trial general ledger of Amalgamated and has spoken to the officers of the defendants concerning the receivables. The Receiver stated that he received conflicting information, but that it appears the receivables from Affiliated Entities and individuals to Amalgamated increased during the fiscal year ending October 31, 1982.

45. George W. Lehr ("Lehr") is the executive director of the Fund and of the Pension Fund and has held this position since October 1, 1981.

46. In the summer of 1982 James Coghlan, an attorney for the Fund, brought a document to Lehr's attention which was filed in the case of *United States v. Dorfman*, 81 CR 269 ("81 CR 269") (N.D.Ill., Indictment filed May 22, 1981) and listed a number of taped conversations, including a taped conversation between Dorfman and O'Malley. At the time, the Fund was paying the litigation defense costs for O'Malley in connection with 81 CR 269 in which O'Malley was a defendant.

47. As a result of the document received by Lehr, a special meeting of the Trustees was convened on August 10, 1982, and the Trustees voted unanimously to sever any further legal fees for O'Malley. At that meeting the Trustees also discussed what effect the document might have in connection with the Fund's relationship with Amalgamated.

48. In August 1982 the Fund was served with a federal grand jury subpoena requesting hundreds of documents in connection with the Fund's relationship with Amalgamated as it related to the Retroactive Increase. Lehr reported to the Trustees that the grand jury subpoena related to the tapes and to the intercepted conversation between Dorfman and O'Malley.

49. Lehr learned that on November 23, 1982, a government attorney read into the record in the 81 CR 269 trial transcripts of the taped conversations between Dorfman and O'Malley relating to the fee increase paid by the Fund and, as characterized by the government attorney, kickbacks in relation thereto. This information was reported to the Trustees.

50. Asserting his fifth amendment privilege against self-incrimination in the hearing before this court, Dorfman declined to answer questions propounded to him as to whether O'Malley reported to him on a monthly basis on the activities at the Trustees meetings, whether Dorfman regularly gave O'Malley instructions on how he should vote as a Fund trustee and whether Dorfman attempted to influence O'Malley in his vote as a Fund trustee.

51. Asserting his fifth amendment privilege against self-incrimination in the hearing before this court, O'Malley declined to answer questions propounded to him as to whether he had discussions with Dorfman in April 1979 about receiving regular payments from Dorfman, whether these payments were intended to influence O'Malley's actions as a Fund trustee, whether Dorfman had instructed O'Malley that O'Malley was to discuss anything pertaining to the financing and general operations of

the Fund with Dorfman, whether O'Malley solicited or received anything of value from Dorfman in exchange for his vote or influence with co-trustees to obtain approval of the prescription drug claims and whether O'Malley had discussions with Dorfman on or before November 1979 about payment to Amalgamated by the Fund for overtime expenditures in connection with processing dental claims.

52. Lehr received documents from Merrill Lynch White Weld, with an attachment from Arthur Anderson & Company, evaluating Amalgamated's assets in connection with the Fund's proposed acquisition of those assets. According to Lehr, the documents indicate that, on a cash receipt and disbursement basis, Amalgamated realized a profit of approximately $4,500,000.00 for the year 1981 as a result of its contract with the Fund. This information was conveyed by Lehr to the Trustees and discussions were held regarding that information as to any effect it had on the 1980 Modification.

53. On December 3, 1982, Amalgamated implemented a four-day work week for processing claims. Subsequently, the amount of unprocessed claims increased from 11,000 claims on December 3, to 13,000 on December 10, to 17,000 on December 17 and to 24,000 on December 24. Based on the average number of claims processed daily by Amalgamated, this backlog represents approximately four days of work.

54. On December 15, 1982, Dorfman, O'Malley, and other defendants were convicted in 81 CR 269 of violations of Title 18 U.S.C. §§ 371, 1952, and 1343, by, among other things, devising and attempting to execute a scheme to defraud the Pension Fund. This was Dorfman's second conviction of criminal activity involving an employee benefit plan. In 1972 Dorfman was convicted of accepting a kickback for arranging a loan from the Pension Fund, for which he was sentenced to one year in custody and a term of probation.

55. The sentencing in 81 CR 269 is scheduled for February 10, 1983 and a hearing on aggravating and mitigating factors is anticipated. Dorfman is currently at liberty on a $5,000,000.00 bond imposed by Judge Prentice H. Marshall. Judge Marshall issued a memorandum opinion concerning the bond in which he stated that Dorfman could reasonably expect a sentence of substantial incarceration and that Dorfman represented a substantial risk of flight. Judge Marshall held that a full cash bond was required, but the Seventh Circuit ruled that the bond could be satisfied by posting $1,000,000.00 in cash and all of the stock of Amalgamated. This was done.

56. Amalgamated paid at least some of the personal defense costs incurred by Dorfman in 81 CR 269.

57. At the December 21, 1982, meeting of the Trustees, Lehr recommended that the Fund discontinue monthly payments to Amalgamated for the claims processing services provided to the Fund. This recommendation was based on the advice of Fund counsel and of the independent special counsel to the Pension Fund. The Trustees voted unanimously not to make any further payments, including the December 1982 payment, to Amalgamated unless a receiver were appointed for Amalgamated.

58. At this time the Fund has no ability to process health and welfare claims itself. All of the software, all of the programs and all of the trained employees necessary to process claims are in the custody and possession of Amalgamated. For the Fund to obtain an alternate claims service provider would require, at a minimum, a six to ten month lead time. Thus, if Amalgamated does not continue to process claims for the Fund, the processing would discontinue and an enormous backlog would occur, jeopardizing the participants' and beneficiaries' ability to receive benefits to which they are entitled.

59. Breen testified that if the Fund did not pay for Amalgamated's services Amalgamated would not stop providing claim service to the Fund. Breen further testified that if such a dispute arose he would refer the matter to Amalgamated's attorneys, Jenner & Block. Breen also testified that he would follow the advice of Jenner & Block on this matter.

60. Jenner testified that he had considered this issue of non-payment on more than one occasion as principal attorney for Amalgamated. Jenner testified that under no circumstances would he advise Amalgamated to stop performing services for the Fund. He would instead advise Amalgamated to continue services and seek appropriate relief for breach of contract in court.

61. In his ruling on the Secretary's motion for a preliminary injunction in 1978, Judge McMillen found on the record before him that Amalgamated's ability to process claims "approach[es] perfection". There is no evidence that the Fund has received any criticism or complaints concerning the quality of the claims processing service provided by Amalgamated in the past few months. The Fund has made no such complaints to Amalgamated and the Fund has not exercised its contractual rights regarding termination of the existing agreement between Amalgamated and the Fund.

62. The Fund and Amalgamated entered into an agreement on November 3, 1981 under which the Fund is to purchase the claims processing assets of Amalgamated. Under ERISA, the purchase must be approved by the Secretary as an exempted prohibited transaction. *See* 29 U.S.C. §§ 1106 and 1108(a) (1976). An application for such exemption is pending in the Department of Labor's Office of Fiduciary Standards.

63. The Receiver assumed its responsibilities under the temporary restraining order on December 29, 1982, and it continues to carry out those duties to date.

64. On January 5, 1983, the employees of Amalgamated, who are represented by a local affiliate of the Teamsters union, filed a grievance with Amalgamated in which they complain of the "government persons on the premises" of Amalgamated because their presence creates "difficulties and tremendous stress and tension on the job."

## CONCLUSIONS OF LAW [1]

As a general rule, a district court should grant a preliminary injunction only if (1) the plaintiff has at least a reasonable likelihood of success on the merits; (2) no adequate remedy exists at law and, therefore, there will be irreparable harm if the preliminary injunction is not granted; (3) the threatened injury if the injunction is not granted outweighs the threatened injury to the defendants if it is granted; and (4) granting the injunction is not contrary to public policy. *Pratte v. NLRB* ("*Pratte*"), 683 F.2d 1038, 1041 (7th Cir.1982). Entering a preliminary injunction is an extraordinary remedy and should only be used in a case "clearly warranting it." *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976).

The Secretary contends that when a federal agency seeks to obtain a preliminary injunction to enforce a federal statute a different standard of proof applies and the agency need not establish the existence of irreparable harm. Specifically, the Secretary contends that in such a case the agency need only show (1) a violation of a statute designed to protect the public interest; (2) a reasonable likelihood of future violations; and (3) that the injunction will further the policies of the statute. In support of this contention, the Secretary cites *CFTC v. Hunt* ("*Hunt*"), 591 F.2d 1211, 1219–20 (7th Cir.1979), and *SEC v. Advance Growth Capital Corp.* ("*Advance Growth*"), 470 F.2d 40, 53–54 (7th Cir.1972).

This court does not agree that the Secretary has a different burden of persuasion here than any other litigant seeking to have a court exercise the broad powers of a chancellor in equity on a motion for preliminary injunction. Although the *Hunt* and *Advance Growth* decisions may establish that different standards apply when a government agency is seeking a permanent injunction enjoining future violations of a statute after a finding of a past violation,

---

1. The defendants have not objected to the Secretary's assertions that the court has jurisdiction over these actions and the defendants and

that venue is proper here. The court finds jurisdiction and venue proper. *See* 29 U.S.C. § 1132(e)(1) and (2) (1976).

those cases do not establish that the traditional standards on a motion for preliminary injunction are inapplicable here.[2] Therefore, the court will apply the standards set forth in *Pratte,* recognizing that "if [the] court finds that under applicable law there is no probability of success on the merits and no irreparable injury, it is unnecessary for the court to consider the other factors." *Kolz v. Board of Education of Chicago,* 576 F.2d 747, 749 (7th Cir.1978); *see also O'Connor v. Board of Education of School Dist. No. 23,* 645 F.2d 578, 580 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981).

With respect to the merits of the complaints and the Secretary's likelihood of prevailing on them, the Secretary asserts that both the Trustees and Dorfman (through his control over the Affiliated Entities) have breached fiduciary duties under ERISA. Specifically, the Secretary proposes that the court conclude that:

> The evidence demonstrates that the trustees violated the fiduciary standards set down in section 404 of ERISA and entered into prohibited transactions as described in section 406 of ERISA by transferring funds in the form of overtime payments for processing of dental claims, cost plus payments for prescription processing, and, ultimately, by modifying the contract for claims processing, without receiving consideration or value for the fund.

Secretary's Proposed Conclusion of Law No. 13. In addition, the Secretary argues that Dorfman, Amalgamated and the Affiliated Entities are fiduciaries within the meaning of ERISA, *see* 29 U.S.C. § 1002(21)(A), (1976), for two reasons:

> ... (1) they have continuously exercised authority and control with respect to the disposition of plan assets to the extent they have effectively controlled the Plan's [Fund's] relationship with them and thus have been able to dictate the particulars of the relationship, including

the sums paid by the Plan [Fund] to Amalgamated; and (2) have continually had discretionary authority or control in the management or administration of the Plan [Fund] through claims processing decisions. These decisions control annual benefit disbursements by the Plan [Fund] to the extent of several hundred million dollars.

Secretary's Proposed Conclusion of Law No. 20. With that predicate legal conclusion, the Secretary submits that Dorfman and the other defendants have breached their fiduciary duties by misrepresenting the financial condition of Amalgamated when seeking increased fees from the Fund and by obtaining increased fees from the Fund without providing any further services to the Fund than Amalgamated was already obligated to perform.

■ On each of these claims the court cannot find that the Secretary has established at this time a reasonable likelihood of prevailing on the merits on the record created in the instant hearing. First, the Secretary has not shown at this time that Dorfman and the defendant entities exercise the discretionary authority or control over the Fund or its assets such that Dorfman and the entities are fiduciaries within the meaning of section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) (1976), or the relevant Department of Labor Regulation, 29 C.F.R. § 2560.503–1(g)(2) (1981). *See Austin v. General American Life Ins. Co.,* 498 F.Supp. 844 (N.D.Ala.1980). The testimony presently adduced shows that Amalgamated provides claims processing services for the Fund using adjustment standards established jointly by the Fund and Amalgamated and that the Fund makes the final determination on any contested payments that have been made according to the adjustment standards.

Second, with respect to the 1980 Modification, it is clear that the amendment was made only after lengthy negotiation by the Fund, Amalgamated and attorneys repre-

**2.** Even if the Secretary is correct and the more limited standards apply, the result here would be the same because the Secretary has not proved on this record that violations of ERISA have occurred nor that an injunction is warranted at this time.

senting each, and that its adoption by the Trustees was initially defeated and then approved on the second vote. Even assuming that misrepresentations concerning Amalgamated's financial condition would establish the 1980 Modification to be a breach of fiduciary duty, the Secretary has not established on this record that Amalgamated's financial condition was not actually as it was represented. The submission of a financial statement without any testimony from qualified persons to interpret the statement's meaning is insufficient to show that Amalgamated was not operating at a deficit in May 1980. Finally, concerning the payments the Fund made for processing of prescription claims, the overtime payments relating to a backlog of dental claims, and the increased payments under the 1980 Modification, the Secretary has not met his burden of showing that the Trustees breached their fiduciary duties by failing to receive any consideration for these additional payments. The evidence currently presented tends to show that these payments resulted from agreements reached in arms-length negotiations of disputed matters.

The only issue raised to date on which it appears that the Secretary may eventually be able to show a breach of fiduciary duty concerns O'Malley. In this hearing, the court did not consider two of three transcripts of taped conversations between O'Malley and Dorfman concerning what the Secretary submits is a kickback arrangement between O'Malley and Dorfman in relation to the claims adjustment agreement between the Fund and Amalgamated. If these transcripts are accurate and the conversations refer to what the Secretary argues and if the tapes were lawfully obtained and admissable here, then the Secretary may be able to demonstrate a likelihood that O'Malley breached his fiduciary duties. However, even assuming such a demonstration could be made, that alleged breach in and of itself has not caused the suggested irreparable harm for which the Secretary is seeking relief.

Turning to a consideration of whether irreparable harm will occur if an injunction is not issued, the court notes at the outset that the situation before it today is different than the situation which existed on December 29, 1982, when the Secretary appeared before Judge Bua in an ex parte proceeding. Then the court was asked to grant a temporary restraining order based on a complaint verified by the Secretary's attorney as an officer of the court and on the affidavit of Executive Director Lehr which indicated that the processing of claims was in jeopardy. Since that time, the court has had the opportunity to hear extensive testimony and review a large number of exhibits. In addition, the court has been able to review the Receiver's interim reports concerning Amalgamated and its processing of claims for the Fund.

The court recognizes that the appointment of a receiver can be an appropriate remedy under ERISA where serious fiduciary violations have occurred. See *Marshall v. Robbins*, 624 F.2d 1106 (7th Cir. 1980) (unpublished); *Marshall v. Snyder*, 572 F.2d 894 (2d Cir.1978). However, "[e]quitable receiverships are drastic remedies which often fall short of their intended objectives." *Advance Growth*, 470 F.2d at 54. It is the court's present conclusion, based on the record now established, that such extraordinary relief is not required and should no longer be continued.

The Secretary sought emergency relief from the court to prevent alleged irreparable harm that might result from the discontinuation of claims processing services for the Fund by Amalgamated. Based on the record presented, the court acknowledges that if the claims processing ceased today, then substantial harm would result to the participants and beneficiaries of the Fund because for at least six months, the Fund would not be able to arrange for processing of the claims. Assuming, then, that the prevention of this harm is deserving of some relief from the remedial powers of a court of equity, the important focus here must be on the two alleged reasons why Amalgamated may discontinue processing claims.

The first basis on which the Secretary seeks emergency relief relates to the personal circumstances of Dorfman. The Secretary argues that Dorfman may be motivated to, conceal, dispose or destroy assets because of several recent events. These events include: Dorfman's conviction on December 15, 1982; the statement of the trial judge in 81 CR 269 that Dorfman may reasonably expect a substantial period of incarceration and that Dorfman represented a substantial risk of flight; and Dorfman's indictment on July 27, 1982, by a federal grand jury under 18 U.S.C. §§ 371, 844(h)(1), 892 and 1951 (1976) for allegedly extorting funds by means of threatened and actual force. These circumstances led one of the Secretary's attorneys to comment to Judge Bua: "Mr. Dorfman is in a very, very difficult situation right now. There is pressure from all sides. I acknowledge that. . . . At this point, we have no reason to believe that something crazy isn't going to happen. . . . Once the damage is done to the claims processing system, once the assets are gone, there is nothing that we can do." (Transcript 12/30/82 at 71).

The second reason the Secretary submits for the possible cessation of claims processing by Amalgamated is the Trustees' decision to discontinue payments to Amalgamated under the existing contract unless and until a receiver is appointed for Amalgamated. The Secretary maintains that the Trustees' decision is not only reasonable in light of the circumstances but that it is also the Trustees' duty under ERISA. The Secretary then argues that a receiver is necessary because if Amalgamated does not receive payment it will not process claims. Further, the Secretary submits that Amalgamated would be unable to continue functioning at all because the Fund's business is Amalgamated's only source of income.

This court does not find that irreparable harm is imminent under either theory advanced by the Secretary. With respect to the possibility that Dorfman might flee the country with assets, sabotage the software or in any way deliberately interfere with the orderly processing of claims at Amalgamated, the proof is wholly lacking. Indeed, this court draws the opposite inferences from the existing facts. Dorfman has not yet been sentenced for his December 1982 conviction and a hearing on aggravation and mitigation is scheduled prior to the sentencing in February of 1983. It is therefore unlikely that Dorfman would take such a drastic step as destroying or disposing of the valuable assets of Amalgamated. Further, the destruction or disposition of Amalgamated's assets would jeopardize the 50% ownership interest of Dorfman's mother and the wages and salaries of many of Dorfman's family members, relatives and friends and the long-time employees. With respect to concern that Dorfman will flee the country, there is no doubt that Judge Marshall perceived a substantial risk, but a substantial bond was imposed to mitigate that risk. The Court of Appeals modified the method by which the bond could be satisfied and this court has been presented no evidence suggesting that Dorfman may violate the conditions of the bond. Thus, the court cannot find that the claims processing services at Amalgamated are in jeopardy because of a likelihood that Dorfman will somehow interfere with those services. The appointment of a receiver, therefore, is not appropriate for that reason.

As for the Trustees' decision to discontinue payments to Amalgamated, a more real possibility of disruption of services at Amalgamated exists. Surely Amalgamated cannot be expected to continue performing indefinitely under the existing contract without being paid for its services. However, the unequivocal testimony of Breen and Jenner is that Amalgamated would not stop processing claims if it did not receive a monthly payment from the Fund. Rather, it would seek immediate relief in state court. Although such testimony might be characterized as self-serving or tailored to refute the Secretary's argument, it is credible in two respects. First, a legal resolution to the contract dispute, as opposed to a nonperformance stand-off, is consistent with the interests of corporate self-preservation. A second and related indication of

credibility concerns the proposed sale of assets to the Fund, which is awaiting the Secretary's approval. A non-functioning Amalgamated would most likely diminish the value of the assets Amalgamated has to offer and would consequently detrimentally impact on the decision whether the assessed value of Amalgamated is appropriate. Thus, giving credence to Breen's and Jenner's testimony, the court cannot find that the Fund's failure to pay for Amalgamated's services would cause an immediate nation-wide crisis such that a receiver is necessary.

The court recognizes that circumstances may change and there is no absolute guarantee that if the Fund does not make the next monthly payment, Amalgamated may respond by discontinuing claims processing. If this should occur, the Secretary and the Fund may immediately renew their application for injunctive relief. The court notes, however, that even if Amalgamated takes that course, a receivership is not necessarily and automatically appropriate. It can be argued that a receiver would ensure the short-term continuation of services. However, the Trustees' decision to make payment conditional upon the appointment of a receiver does not bind a court of equity to accept only that form of remedy to prevent the perceived harm. The matter is simply not an either-or situation. The powers of a court of equity are not unfettered, but they certainly should be broad enough to fashion some temporary injunctive relief protecting the processing of claims pending final disposition of the Secretary's claims. In any event, on this record at this time, the court cannot conclude that a receiver is necessary to ensure the processing of claims at Amalgamated.

In addition to what the court perceives to be insufficient grounds to justify a receiver, other factors have led to the court's conclusion that the receivership should be dissolved. The testimony has shown that Dorfman is not involved in the day-to-day operation of Amalgamated and the Receiver has found Breen to be a very capable executive administrator of Amalgamated. The court has also noted Judge McMillen's finding that Amalgamated's ability to process claims "approach[es] perfection". Other than a backlog that amounts to four days of work, no evidence has been presented that suggests that Amalgamated has not been performing its contract. Indeed, the Fund has made no such complaints. Further, the contract now in existence has not been challenged by the Secretary and it obligates the Fund to pay smaller monthly fees than previous contracts. Finally, the court cannot set aside the efficiencies and stability that the long association of the Fund's and Amalgamated's day-to-day personnel have brought to the orderly functioning of the claims processing services.

Accordingly, the Secretary's motion for a preliminary injunction is denied. In the interest of assuring an orderly transition and to implement earlier entered orders, the receivership will remain in effect until the close of business on January 21, 1983, and the Receiver has until January 28, 1983 to submit its final report.