**HARTFORD FIRE INSURANCE CO., Plaintiff,**

v.

**Brian GARVEY, Defendant.**

**No. C 84–0083 TEH (CW).**

United States District Court, N.D. California.

Dec. 20, 1985.

John E. Lenker of Meadows, Smith & Brown, San Francisco, Cal., for plaintiff.

William T. Brandlin, Torrance, Cal., for defendant.

## ORDER DENYING MOTION FOR PROTECTIVE ORDER

CLAUDIA WILKEN, United States Magistrate.

On October 11, 1985, Plaintiff Hartford Fire Insurance (hereinafter "Hartford") moved for protective order, seeking the return of documents produced to Defendant Brian Garvey on the grounds of attorney client privilege and work product immunity. A hearing date of November 21, 1985 was set, but the hearing was vacated on request of all parties. The Court has considered the written arguments of all parties, and has examined the documents submitted *in camera* by Hartford. The

Court concludes for the reasons set forth below that the documents are not protected by the attorney client privilege or the work product immunity. Accordingly, the motion for protective order shall be and hereby is denied.

## I. FACTUAL BACKGROUND

This action arises out of a claim on a marine insurance policy issued by Hartford to Garvey. Garvey sought to collect on the policy claiming that the insured yacht was stolen during the policy period. Hartford refused the claim, and brought this action for rescission or declaratory relief, alleging that the policy was secured on the basis of material misrepresentations, that Garvey failed to pay the premium for the policy, and that there was in fact no theft. Hartford's complaint alleged that its claim was an admiralty and maritime claim. Garvey counterclaimed for bad faith failure to investigate and settle the claim. In their joint pre-trial statement, the parties agreed that "the causes of action are maritime in nature and principles of general maritime law should apply."

The instant motion arises out of the production by Alan Warwick, at his deposition, of documents now claimed to be privileged and protected by work product immunity. The deposition was conducted in order to perpetuate Warwick's testimony and to authenticate documents, and was initiated by Hartford.

Warwick's precise status with respect to the documents, this litigation, and Hartford's counsel, formerly "Meadows, Dorris, Stryker & Salentine" and "Meadows and Dorris," now "Meadows, Smith & Brown" (hereinafter "Meadows"), is not clear from the record. Warwick is the designer of the Cardinal 46' sloop, the yacht at issue in this litigation, and is thus a percipient witness in this litigation with respect to the identity of relevant boats. However, Hartford claims that Warwick is also Hartford's investigator and expert advisor on technical marine matters in the litigation. Finally, Meadows claims that it is representing Warwick in the related matter of War-

wick's attempts to get full royalty payments on the Cardinal 46 from the Sen Koh shipbuilding company. During the course of the relationship between Meadows attorney John Lenker and Warwick, various written communications passed between them, and Lenker sent Warwick documents, now claimed to be privileged and/or subject to work product immunity, allegedly to assist Warwick in his investigations.

The time period during which Warwick was represented by Meadows has not been established. In deposition, Warwick stated that at some unspecified time he gave Meadows authority to try to sort out the amount of royalty owed him and to seek payment for him. However, he stated that he had had no further contact with the Meadows firm on that issue, that Meadows had not been effective in doing anything to recover royalties, and that as far as he was concerned, he had no further need for counsel. Meadows attorney John Lenker asked him whether he was "aware that counsel ... is still representing you in recovery of the royalties," to which Warwick replied, "I haven't heard anything from them, no."

Warwick's status as Hartford's investigator is also unclear from the record. Apparently Lenker originally contacted Warwick by telephone to ascertain the nature and extent of his knowledge about the Cardinal 46 sloops built by the Sen Koh shipyard. It would seem that they struck up a cooperative relationship, with both willing to share their information, and the Meadows firm willing to pay for Warwick's time and expenses in responding to its requests for information. By letter dated June 20, 1984, Lenker requested some of Warwick's records, asked Warwick to get brochures on masts sent to Sen Koh, and requested that Warwick pass along any information he might "run across" about certain individuals. The letter further states that Lenker had "taken the liberty of enclosing some documents" from which he hoped Warwick might recognize "a significant fact." Finally, Lenker later asked Warwick to investigate the identity and sale of

another Cardinal 46 sloop in Australia. Although Warwick was apparently reimbursed for his time and expenses in providing assistance to the Meadows firm, the relationship appears to have been a very casual one, not involving any promise, explicit or implied, that Warwick would keep confidential any client confidences passed along by Meadows.

Warwick's deposition was conducted, as scheduled by Hartford, on September 28, 1985. Warwick flew from New Zealand to Los Angeles, was picked up at the airport by Lenker, and was driven directly to the deposition, which took place immediately upon his arrival. Warwick had brought with him, at Hartford's request, his file of documents concerning the Cardinal 46 yachts. Lenker states that he instructed Warwick *not* to bring the written communications between the Meadows office and Warwick, as they were privileged; however, Warwick did bring those communications in the file. Warwick referred to some of the documents in the file during the deposition, but it does not appear from the deposition transcript that he referred to any documents now claimed to be privileged.

There are several different versions about the transmittal of the documents and claim of privilege, two of which are offered by Lenker. Apparently immediately after or towards the end of Warwick's deposition, defense counsel William Brandlin asked Garvey's wife (an out of state lawyer) to review the documents and select the ones to be copied. Hartford's memorandum of points and authorities, signed by Lenker, and Garvey's opposition papers indicate that Mrs. Garvey then selected documents, made two copies of each, and gave one set of copies to Lenker at his request. According to Brandlin, he reviewed Mrs. Garvey's selections before the copies were made. Upon examination of the selected documents, Lenker realized for the first time that the communications between his office and Warwick were included, and he went on the record to claim attorney client privilege and work product immunity.

According to Lenker's declaration, however, he went on the record to claim the privilege generally with respect to any documents generated by his office when Mrs. Garvey first took the documents for inspection, and after he saw the documents actually produced and copied, he again went on the record to assert the privileges.

The deposition record contains a statement by Lenker, after the close of Warwick's testimony and some discussion off the record, that:

> [T]hose materials generated from ... the law office of Meadows ... be identified as matter which plaintiffs are asserting the attorney-client privilege, and/or work product privilege, in that Meadows and Dorris and Judge Lan in Taipei represent Mr. Warwick in his efforts to identify and collect his royalty payments from Sen Koh pertaining to the Cardinal 46.

The deposition record reflects a further statement by Lenker, after further discussion off the record, that:

> We have a letter dated September 4, 1984, marked Personal and Confidential to Mr. Don Kenyon, Ocean Marine's claim manager, San Francisco, Hartford. Plaintiffs would like to assert the attorney-client privilege, since that is the client in this case, and work-product privilege as to that document.

There is no indication in the transcript as to when, in relation to the production of documents off the record, the two statements were made. However, it seems most likely, and the Court finds, that both statements were made after the documents had been copied and inspected by Lenker; otherwise, it would appear that privilege was claimed only with respect to the September 4, 1984 letter.

On September 30 and October 2, 1985, Lenker requested the return of the documents from Garvey's counsel Brandlin. Brandlin refused to return the documents on the ground that they were not privileged. On October 11, 1985, Hartford brought this motion, seeking the return or destruction of all copies of the documents, the destruction of all other writings com-

menting on or derived from the contents of the inadvertently produced documents, and certification by Garvey of compliance with the order.

## II. APPLICABLE LAW

Hartford argues that state law applies to the determination of privilege in this case under Rule 501, Federal Rules of Evidence. Rule 501 states that privilege issues shall be determined according to the federal common law, except with respect to an element of a claim or defense as to which state law supplies the rule of decision. Hartford puts forward no argument as to why state law would supply the rule of decision with respect to claims which Hartford has at all times contended sound in admiralty and maritime law. Therefore, the federal common law will be applied in determining the privilege issues.

## III. ATTORNEY CLIENT PRIVILEGE

Hartford asserts generally that some of the documents are privileged as confidential communications between Meadows as Hartford's counsel and Warwick as its investigator, and that some are privileged as confidential communications between Warwick as client and Meadows as Warwick's counsel. However, it does not state which argument applies to which documents, nor does it make out all the elements of the privilege even in a conclusory fashion. Hartford did submit the documents for *in camera* inspection; however, inspection of the documents does not supply the missing elements.

 The attorney client privilege applies to confidential communications by a client (or a person who sought to become a client) to a lawyer acting in the capacity of a lawyer (or a lawyer's subordinate), made for the primary purpose of securing legal advice or legal services, and not for the purpose of committing a crime or tort, provided that the privilege is properly asserted, and has not been waived. *E.g., Underwater Storage Inc. v. U.S. Rubber Co.*, 314 F.Supp. 546, 548 (D.D.C.1970), *United States v. United Shoe Machinery Corp.*,

89 F.Supp. 357, 358 (D.Mass.1950). The privilege applies also to other confidential communications to the extent that they reveal client confidences which are themselves privileged.

 Because federal policy favors broad discovery, and the attorney client privilege has the effect of withholding relevant information from the factfinder, the privilege is narrowly construed. *E.g., Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th Cir. 1981), *Underwater Storage, supra*, 314 F.Supp. at 547. The proponent of the privilege carries the burden of establishing all elements of the privilege, including confidentiality, which is not presumed, *e.g., In re Grand Jury Proceedings*, 727 F.2d 1352, 1358 (4th Cir.1984), and non-waiver, *e.g., Weil, supra*, 647 F.2d at 25. The confidentiality element and waiver are closely related inasmuch as any voluntary disclosure inconsistent with the confidential nature of the attorney client relationship waives the privilege. *E.g., United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982), *Weil, supra*, 647 F.2d at 24, *In re Horowitz*, 482 F.2d 72, 80–82 (2nd Cir.1973).

 Here the necessary elements of the privilege simply have not been shown. With respect to any privilege held by Hartford, none of the documents are communications made by Hartford to Meadows, and it has not been shown that any of the documents reveal confidential communications made by Hartford to Meadows. None of the documents reveal such client confidences on their face. Furthermore, even if any of the documents contained client confidences, it has not been shown that the privilege was not waived by their transmission to Warwick. *See, e.g., United States v. Willis*, 565 F.Supp. 1186 (S.D. Iowa 1983). Here it was not shown that Warwick was the agent of Hartford or Meadows, or had any type of confidential relationship to them; only a casual cooperative relationship with Meadows was shown. Furthermore, it was not shown that transmittal of the documents to War-

wick was necessary in order for Meadows to provide legal services to Hartford.

■ With respect to any privilege held by Warwick, it has not been shown that any of the documents are or reflect communications made in the context of an attorney-client relationship for the purpose of securing legal advice or services. None of the documents reveal such an attorney client relationship on their face. Furthermore, had any privilege existed, it would appear that Warwick, who had been advised by Lenker of the privileged nature of the documents and advised against producing them, voluntarily waived the privilege by producing the documents at his deposition.

## IV. WORK PRODUCT IMMUNITY

Hartford does not make out the elements of the work product immunity with respect to any of the documents. However, the Court has examined the documents *in camera*. Documents 1, 2, 3, 7, and 9 (as numbered by Hartford in its Memorandum of Points and Authorities in Support of Motion for Protective Order) appear on their face to be work product as they seem to be documents prepared by Meadows in the course of investigation for this litigation. Documents 4, 5, 10, and 11 could be Warwick's work product if Warwick's status as Hartford's investigator were shown; however, it is Hartford's burden to establish that relationship, which it has not done. Documents 6, 8, and 12 do not appear to be work product at all, and there is no showing which would bring them within the scope of that protection. With respect to Documents 1, 2, 3, 7, and 9, then, the issue arises as to whether the work product immunity was waived.

■ Waiver of work product immunity requires more than the disclosure of confidential information; the disclosure must be inconsistent with the adversary system. *E.g., Permian Corp. v. United States,* 665 F.2d 1214, 1219 (D.C.Cir.1981), *Transamerica Computer Co. Inc. v. International Business Machines Corp.,* 573 F.2d 646 (9th Cir.1978), *Chubb Integrated Sys-*

*tems Ltd. v. National Bank of Washington,* 103 F.R.D. 52, 63 (D.D.C.1984). Here, although the precise relationship between Meadows and Warwick is not clear, it does not appear that Meadows' disclosure to Warwick is inconsistent with the adversary system; thus the immunity was not waived by disclosure to Warwick.

When the disclosure is made to the adverse party, on the other hand, the distinction between waiver of attorney client privilege and of work product immunity disappears, as disclosure to the adverse party is inherently inconsistent with the adversary system. Thus, the principles of waiver of attorney client privilege apply to the analysis of waiver of work product immunity by production to Garvey. *See, e.g., Permian Corp., supra,* 665 F.2d at 1219, *Transamerica Computer Co., supra,* 573 F.2d 646, *Chubb Integrated Systems, supra,* 103 F.R.D. at 63.

The disclosure to Garvey is asserted to have been an "inadvertent" disclosure by Meadows inasmuch as Lenker states that he did not realize that the privileged documents were in Warwick's file at the time that the file was produced. It could also be seen as an intentional disclosure by Warwick, which would seem to waive the immunity. However, as attorney work product "belongs" to the attorney, the disclosure will be analyzed under the case law applying to inadvertent disclosure.

Hartford argues that inadvertent disclosure of documents, even if negligent, cannot constitute a waiver, as a waiver must be intentional. This argument is not well supported by the relevant authorities. Plaintiff relies in part on unreported, and thus non-authoritative, cases, each of which falls short of supporting its position that inadvertence can never constitute waiver. *Data Systems of New Jersey v. Philips Business Systems Inc.,* No. 78 Civ. 6015, slip op. (S.D.N.Y.1981) (where "every precaution possible was taken" to avoid disclosing privileged documents, the inadvertent disclosure of one document in the course of producing thousands of doc-

uments does not constitute a waiver), *Moore v. Metropolitan Life Ins. Co.,* No. 82 Civ. 1803, slip op. (N.D.Ill.1982) (where the privilege was asserted before the inadvertent disclosure was made, there was no waiver), *Donavon v. Robbins,* 558 F.Supp. 319 (N.D.Ill.1983) (where a strenuous discovery schedule had been imposed by the court, and all appropriate precautions were taken, the inadvertent disclosure of one document, marked sensitive and separately maintained, does not constitute a waiver).

Plaintiff also relies on a line of reported cases of limited precedential value. First, Plaintiff cites *Connecticut Mutual Life Ins. Co. v. Shields,* 18 F.R.D. 448, 451 (S.D.N.Y.1955), in which the ruling was based on a New York privilege statute. Next, Plaintiff cites *Dunn Chemical Co. v. Sybron Corp.,* 1975 Trade Cases ¶ 60,561 (S.D.N.Y.1975). The *Dunn Chemical* court found no waiver from the inadvertent production of two documents upon a finding that the "interests of fairness will best be served at this time by finding that no waiver has occurred," but did not explain the circumstances of the production there. In addition, the *Dunn Chemical* opinion relied on *Connecticut Mutual, supra,* with no acknowledgement that *Connecticut Mutual* was based on New York statutory law.

Finally, Plaintiff cites *Mendenhall v. Barber-Greene Co.,* 531 F.Supp. 951 (N.D. Ill.1982). *Mendenhall*'s precedential value is weakened by the fact that it relies on *Dunn Chemical, supra,* and on a footnote which states a less far reaching principle than that upon which Plaintiff seeks to rely. *Permian Corp. v. United States,* 665 F.2d 1214, 1220, n. 11 (D.D.C.1981) (the privilege is preserved when inadvertent disclosure is made despite diligent precautions in massive expedited discovery). However, *Mendenhall* does provide some support for Plaintiff's position. In *Mendenhall,* documents which would otherwise be protected by the attorney client privilege were left in files produced for inspection by opposing counsel. The court held that no waiver had occurred. In so doing, the court rejected the "strict responsibility doctrine" of Wig-

more, that "the risk of insufficient precautions is upon the client," 8 *Wigmore, Evidence* (McNaughton rev. 1961) § 2325, at 633, stating:

> The better-reasoned rule is that mere inadvertent production does not waive the privilege.... The Wigmore doctrine is atavistic, generating ... harsh results out of all proportion to the mistake of inadvertent disclosure.

The court stated that inadvertent production "is the antithesis" of the concept of waiver as an intentional abandonment of a known right. Therefore, the court held that even though counsel may have been negligent in failing to cull the files for privileged documents before turning them over for inspection:

> [I]f we are serious about the attorney-client privilege and its relation to the *client's* welfare, we should require more than ... negligence by *counsel* before the client can be deemed to have given up the privilege (emphasis in original).

This case does not represent the majority rule. Its reasoning is also inapplicable to the instant case inasmuch as here only the attorney's work product immunity, and not the client's attorney-client privilege, is at stake.

The old "strict responsibility" rule described above does not represent the majority rule either. Rather, the modern trend seems to be towards a case by case determination of waiver based on a consideration of all the circumstances. The majority of cases do hold, or take for granted, that inadvertent disclosure of privileged documents may waive the privilege. *E.g., Permian Corp. v. United States,* 665 F.2d 1214 (D.C.Cir.1981), *First Wisconsin Mortgage Inc. v. First Wisconsin Corp.,* 86 F.R.D. 160, 173 (E.D.Wis.1980), *In re Grand Jury Investigation of Ocean Transportation,* 604 F.2d 672 (D.C.Cir. 1979), *Lois Sportwear, USA, Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103 (S.D.N.Y. 1985), *Chubb Integrated Systems Ltd. v. National Bank of Washington,* 103 F.R.D. 52 (D.D.C.1984), *In re Grand Jury Pro-*

*ceedings Involving Berkley & Co., Inc.,* 466 F.Supp 863 (D.Minn.1979), *Ranney-Brown Distributors Inc. v. E.T. Barwick Industries Inc.,* 75 F.R.D. 3 (S.D.Ohio 1977), *W.R. Grace & Co. v. Pullman, Inc.,* 446 F.Supp. 771 (W.D.Okla.1976), *Underwater Storage Inc. v. United States Rubber Co.,* 314 F.Supp. 546 (D.D.C.1970). The "inadvertence" of the production is considered as one factor in determining whether there has been a waiver. *E.g., Chubb Integrated Systems, supra,* 103 F.R.D. at 67.

Some of the cases involving inadvertent disclosure of privileged material focus on whether there still exists sufficient confidentiality that the court can preserve the privileged nature of the documents despite the disclosure. For example, in *Underwater Storage, supra,* 314 F.Supp. at 549, the court held that once a document was inadvertently produced for inspection, "it entered the public domain. Its confidentiality was breached, thereby destroying the basis for the continued existence of the privilege." *See also In re Grand Jury Investigation of Ocean Transportation, supra,* 604 F.2d at 675 (Where documents were turned over one year prior to the assertion of privilege, and they had already been copied, digested, and analyzed by the time of the motion, the court found that "the disclosure cannot be cured simply by a return of the documents. The privilege has been permanently destroyed").

In *Chubb Integrated Systems, supra,* 103 F.R.D. at 63, the producing party had permitted inspection of some 52,000 pages of documents and withheld other documents as privileged. The discovering party requested copies of 14,000 pages. The producing party withheld some of the documents on the grounds of privilege, claiming that the disclosure had been inadvertent. The court stated that:

"[T]he mere fact that defendants had an opportunity to open a file drawer cannot constitute a 'disclosure' of privileged information.... We will deem a document 'disclosed' where defendant has learned the 'gist' of the document's contents."

The court ordered the discovering party to submit for *in camera* inspection all its notes on the documents and affidavits stating its knowledge of the contents of the documents.

Similarly, in *Ranney-Brown,* the documents had been produced for inspection, the discovering party had designated certain documents for copying, and the producing party had refused to copy documents as to which the privilege was claimed. The court distinguished the case from those in which the discovering party already had a copy of the documents, and set a special hearing to determine whether the confidentiality of the documents had been lost.

Here it is not possible to reconstruct precisely what Garvey and his counsel knew about the documents at the time of the assertion of the privilege. However, from the small number of documents involved, it would appear that Mrs. Garvey and Brandlin must have learned the contents of the documents at the time of inspection. Furthermore, it appears that copies of the documents were actually turned over before the privilege was asserted. Thus, it appears that the confidentiality of the documents was lost.

The other major focus of courts determining whether inadvertent disclosure of privileged material has destroyed the privilege is the degree of care used to protect the documents. *See, e.g., Ranney-Brown, supra* (court commented on the fact that privileged material was mingled with other documents, and that there was no indication of any "special effort" to protect the privileged material).

The analogous cases involving "theft" of the privileged material also rely on this principle. For example, in *Suburban Sew 'N Sweep Inc. v. Swiss-Bernina Inc.,* 91 F.R.D. 254 (N.D.Ill.1981), the proponent of the privilege had thrown the privileged material away, and the documents were found by the opposing party in the proponent's dumpsters. The court held that the privilege had been destroyed, ruling that in determining whether the precautions taken

were adequate to preserve the privilege, the court must consider: (1) the effect on the policy of the privilege of not allowing the privilege in the circumstances, and (2) the ability of the holder of the privilege to protect against the disclosures. *See also In re Grand Jury Proceedings Involving Berkely,* 466 F.Supp. at 869 (court relied on the "modern trend ... toward a principle that the privileged status is not lost when the attorney and client take reasonable precautions to ensure confidentiality").

■ In the instant case, there was a complete failure to take reasonable precautions. Lenker voluntarily turned over work product to Warwick without exacting a promise of confidentiality. When he requested the production of Warwick's file, he apparently asked Warwick to remove the privileged communications. However, he did not check to see if Warwick, who is not a lawyer, had removed all the privileged documents before permitting him to turn over his file to Garvey.

Hartford argues that the rushed schedule in getting Warwick to the deposition made it impossible to check the file before it was turned over to Garvey. However, it was Hartford who initiated the deposition and set up the scheduling. Also, it appears that Lenker could well have examined the file, if not before the commencement of the deposition, at least before the production of the documents. When the time came to turn over the documents, Lenker could have screened each document before permitting Mrs. Garvey to inspect it. This would not have unreasonably delayed the proceedings, as only a cursory examination would have been necessary for Lenker to satisfy himself that a document was not his own work product, and as a small number of documents were involved.

The policy of the work product immunity is to permit an attorney to develop a case fully for litigation without worry that the opposing party would be permitted to invade the attorney's files. That policy would not be harmed in the least by permitting the immunity to be waived where the attorney fails to take any of the available

steps to preserve the confidentiality of the work product.

Hartford cannot argue that Lenker preserved the work product objection by generally asserting privilege as to all documents generated by Meadows at the time the documents were produced. The Court has found that the general assertion was made after the production had been completed. Furthermore, in evaluating the precautions taken to prevent inadvertent waiver of privilege, the precaution of attempting to reserve the right to assert the privilege has not been recognized. In *W.R. Grace & Co., supra,* 446 F.Supp. at 775, documents were produced for copying, but the producing party "specifically reserved its rights to later assert privilege as to any documents produced." Three months later, the producing party attempted to assert the privilege as to some of the documents produced. The court rejected the purported reservation of rights, stating that such a conditional response "unnecessarily complicates what is designed to be a simplified discovery procedure," and thus held that the privilege had been waived by the production:

> Notwithstanding the apparently voluminous amount of discovery involved, [the producing party] could have taken necessary steps to remove purportedly privileged documents prior to permitting discovery.... The purported reservation ... was in effect a legal nullity. One cannot produce documents and later assert a privilege which ceases to exist because of the production.... The same principles ... apply to any possible objection based on purported work product materials....

Thus, even if the court were to accept the version offered in Lenker's declaration that Lenker asserted the privilege generally at the time that the file was produced, that assertion would not prevent waiver of the work product immunity.

To summarize, the recent case of *Lois Sportwear, supra,* 104 F.R.D. at 105, contains a complete and careful analysis which correctly reflects the majority rule on inad-

vertent production. In *Lois Sportwear*, the producing party had paralegals inspect 30,000 pages of documents, of which they compiled 16,000 pages for inspection by the discovering party. The discovering party inspected the documents and requested copies of 3,000 pages. Of those, the producing party withheld 22 documents on the grounds of privilege. The court analyzed the problem by examining the following elements: (1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error, (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the "overriding issue of fairness." In the circumstances of that case, the court held that the producing party had shown non-waiver "by a narrow margin."

Applying the *Lois Sportwear* elements to the instant case, the Court finds that (1) reasonable available precautions were not taken, (2) the error was rectified quickly, (3) the scope of the discovery was quite limited, so that there was no reason not to take the available precautions, and (4) the disclosure was complete in that the contents of the documents were probably learned on inspection and copies of the documents were actually turned over. Thus, of the four factors, three favor a finding of waiver. The "overriding issue of fairness" does not compel the opposite result. Thus, under the majority rule, it appears that the work product immunity was waived by the production of the documents.

There appears to be no Ninth Circuit ruling on circumstances similar to those in the instant case. The one Ninth Circuit inadvertent disclosure case cited is so dissimilar as to have no precedential value here. In *Transamerica Computer Co. Inc. v. International Business Machine Corp.*, 573 F.2d 646 (9th Cir.1978), the court held that no waiver results from the inadvertent production of privileged documents where the circumstances of the production are such that the production should be deemed involuntary. In *Transamerica*, a court in a prior related action had imposed an accelerated discovery schedule such that 17 million pages of documents were produced within 3 months. The producing party had paralegals examine every page produced, and sought to have counsel review documents selected for copying to double-check that no privileged documents were released. The other party objected to the double-checking procedure, and the court upheld the objection, but it ruled that the inadvertent production of documents would not constitute a waiver. The *Transamerica* court held that the production of a small number of privileged documents in the prior action had not waived the privilege as to those documents because the production was not voluntary, but compelled, in that the party was not permitted an adequate opportunity to claim the privilege. The court expressly reserved the question of whether inadvertent disclosure would constitute a waiver in other circumstances.

The case of *Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18 (9th Cir.1981), while not on point, does indicate that the Ninth Circuit would follow the majority rule described above rather than the minority rule of *Mendenhall, supra.* In *Weil*, the issue was whether deposition testimony indicating that the party had relied on the advice of counsel in one respect waived the attorney client privilege with respect to other communications. The proponent of the privilege argued that no waiver of the privilege should be found because no waiver was intended by the testimony. The court rejected the argument, holding that waiver need not be intended, but may be effected by implication. In so holding, the court relied on the example that inadvertent disclosure of privileged documents can result in waiver of the privilege, citing *Underwater Storage, supra.*

Therefore, the Court will apply the majority rule as discussed above, and accordingly holds that any work product protection has been waived by the disclosure of the documents to Garvey.

## V. CONCLUSION

Therefore, the Court hereby finds and orders as follows:

1. The documents have not been shown to be protected by the attorney client privilege.

2. Documents 2, 3, 7, and 9 are within the scope of work product immunity. However, the immunity was waived by Meadows by the production of the documents to Garvey.

3. Accordingly, Hartford's motion for protective order is denied in its entirety.

IT IS SO ORDERED.