John M. **DRAUS, M.D.,** Plaintiff,

v.

**HEALTHTRUST, INC.–THE HOSPITAL CO., Earl J. Tamar and Pam Knight, R.N.**

No. NA 92–0083–C H/G.

United States District Court,
S.D. Indiana,
New Albany Division.

March 24, 1997.

Richard L. Mattox, Mattox & Mattox, New Albany, IN, for plaintiff.

John D. Nell, Wooden, McLaughlin & Sterner, Indianapolis, IN, for defendants.

## ENTRY ON DEFENDANTS' MOTION FOR RETURN OF PRIVILEGED DOCUMENT AND PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

HAMILTON, District Judge.

Defendants have moved to compel plaintiff to return a document they produced to plaintiff's counsel in discovery. The document is a letter dated November 18, 1991, from attorney Claudia Dickerson to the Board of Trustees of North Clark Community Hospital concerning the board's "appellate review meeting" and "joint conference function" regarding the peer review of plaintiff, Dr. John M. Draus. Defendants assert that the production of the document was an inadvertent error that should not amount to waiver of the attorney-client privilege with respect to the document. Plaintiff argues that the document is not properly privileged and that, in any event, any privilege was waived by production of the document. In addition, plaintiff has moved to compel production of other documents as to which defendants have asserted attorney-client and/or attorney work product privilege. For the reasons explained below, defendant's motion to compel return of the Dickerson letter is denied, and plaintiff's motion to compel production of document is granted in part and denied in part.

## I. THE DICKERSON LETTER

The Dickerson letter is on the letterhead of "LAW OFFICES/CLAUDIA W. DICKERSON, P.C." On the first page, it bears the clear legend, underlined, in capital boldface letters: "PRIVILEGED AND CONFIDENTIAL/ATTORNEY–CLIENT PRIVILEGED." In connection with the two-day deposition of plaintiff Draus on August 3–4, 1993, defendants produced approximately 2,400 documents in ten binders. The Dickerson letter was included in the documents produced. The Dickerson letter was also listed in a log prepared by defendants and produced to plaintiff listing responsive documents as to which defendants claimed a privilege from discovery. Defendants' counsel has submitted two affidavits asserting that counsel did not intend to produce the privileged document. The second affidavit (attached to docket no. 139) states that two attorneys and a paralegal reviewed the master set of documents obtained from Dickerson and reviewed the master set for responsiveness and for privilege. The second affidavit also states that both a paralegal and the attorney reviewed the responsive documents to separate out any privileged documents.

During the second day of the deposition, defendants' counsel realized the Dickerson

letter had been produced and demanded its return. Plaintiff's counsel refused. Two days later, defendants' counsel again requested the return of the letter. On August 12, 1993, counsel for plaintiff refused again to return the letter. On December 13, 1993, defendants filed their motion to compel return of the Dickerson letter. On December 20, 1993, plaintiff responded. Magistrate Judge Godich resolved the motion concerning the Dickerson letter on a basis not argued by the parties—that the Dickerson letter was privileged under the Indiana Peer Review Act, Ind.Code § 34–4–12.6–1 *et seq.*, and that that privilege had not been waived by the peer review committee. Plaintiff objected to that determination and asked this court to review it. This court agreed with Judge Godich that the original protective order entered in this case did not satisfy the requirements for a waiver under Ind.Code § 34–4–12.6–2(c). The parties have responded with a joint explanation in which they agree that the waivers were sufficient. The court is satisfied with that submission and finds that the peer review privilege has been waived insofar as it might affect the pending motions. Accordingly, the defendants' motion to compel return of the Dickerson letter is ripe for resolution on the terms the parties originally briefed—the attorney-client privilege.

### A. Application of the Attorney–Client Privilege to the Dickerson Letter

■ Plaintiff argues that there was no attorney-client relationship between Dickerson and the hospital's board of trustees because Dickerson represented only Healthtrust or the hospital. Dickerson represented Healthtrust, but that fact does not preclude the existence of an attorney-client relationship between Dickerson and the hospital's board of trustees. The warning on the letter itself shows that Dickerson thought she was providing privileged legal advice to a client. Dickerson also testified in her affidavit that she viewed the board of trustees as a client because she had been asked to represent the hospital in the Draus peer review, and because she knew that hospital boards of directors in the Healthtrust corporate family delegated peer review authority to the (usu-

ally advisory) boards of trustees of the hospitals involved. The McCain affidavit also supports the conclusion that Dickerson represented the board of trustees. The portion of the Lisa Merchant deposition asserting (before Ms. Merchant's corrections) that Dickerson told her she was "representing the hospital and not the board of trustees" is not persuasive evidence to the contrary. There is no indication that Ms. Merchant, a member of the hospital's clerical staff, would have been focused on the sometimes subtle distinctions in the identity of a lawyer's client in an institutional setting like this one. Merchant's correction of her deposition testimony on this point appears reasonable and credible. Also, there is no indication that anyone at Healthtrust or the hospital took any action inconsistent with the expectation that Dickerson represented the board of trustees as part of her representation of the hospital. Accordingly, the court finds that the Dickerson letter was subject to the attorney-client privilege.

### B. Waiver of the Attorney–Client Privilege

"The essence of the attorney-client privilege lies in the confidentiality of the information." *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 50 (M.D.N.C.1987). Disclosure of a privileged communication during discovery ordinarily results in waiver and loss of the privilege. However, defendants contend that their disclosure of the Dickerson letter in this case should not be deemed a waiver of the privilege because the disclosure was inadvertent. Defendants rely on at least two distinct lines of cases. One line of cases holds that an inadvertent disclosure of a privileged communication cannot result in waiver of the privilege; the other holds that inadvertent disclosure does not necessarily result in a waiver. Defendants also contend that they took reasonable measures to prevent accidental disclosure of privileged documents.

In *In re Recombinant DNA Technology Patent and Contract Litigation,* MDL No. 912, slip op. at 8–9, 1994 WL 270712 (S.D.Ind. March 22, 1994), Judge Dillin re-

viewed the three principal approaches taken by federal courts in cases of inadvertent disclosure of privileged communications. Some cases have applied a test of strict accountability, holding that nearly any disclosure of the communication waives the privilege. See, *e.g., In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989): *F.D.I.C. v. Singh,* 140 F.R.D. 252, 253 (D.Me.1992); *International Digital Sys. Corp. v. Digital Equip. Corp.* 120 F.R.D. 445, 449 (D.Mass.1988) ("there is no order I can enter which erases from defendant's counsel's knowledge what has been disclosed"). In *In re Sealed Case,* the Court of Appeals for the District of Columbia Circuit explained:

> Although the attorney-client privilege is of ancient lineage and continuing importance, the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant. We therefore agree with those courts which have held that the privilege is lost " 'even if the disclosure is inadvertent.' "

> \*    \*    \*    \*    \*    \*

> [I]f a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels—if not crown jewels. Short of court-compelled disclosure or other equally extraordinary circumstances, we will not distinguish between various degrees of "voluntariness" in waivers of the attorney-client privilege.

877 F.2d at 980 (citations and footnotes omitted). Courts taking this approach have noted that courts should not be consumed with searching for the true intention of the disclosing party nor in exercising 20–20 hindsight concerning the adequacy of the precautions taken. See, *e.g., International Digital Sys.,* 120 F.R.D. at 449 (concluding that courts that examine adequacy of disclosing party's precautions nearly always find that precautions were inadequate because they were not effective; "I do not see this result as a significant advance in jurisprudence."); *Underwater Storage, Inc. v. United States Rubber Co.,* 314 F.Supp. 546, 548–49 (D.D.C. 1970) (production of document for inspection destroyed basis for privilege).

Other courts have held that unintentional disclosure cannot waive the privilege. These courts have reasoned that a waiver of the privilege must be intentional, and that inadvertent disclosure therefore cannot waive the privilege. See, *e.g., Helman v. Murry's Steaks, Inc.,* 728 F.Supp. 1099, 1104 (D.Del. 1990); *Kansas–Nebraska Natural Gas Co. v. Marathon Oil Co.,* 109 F.R.D. 12, 21 (D.Neb. 1983); *Georgetown Manor, Inc. v. Ethan Allen, Inc.,* 753 F.Supp. 936, 938–39 (S.D.Fla. 1991); *Mendenhall v. Barber–Greene Co.,* 531 F.Supp. 951, 954 (N.D.Ill.1982).

Other courts take a middle ground, deciding case-by-case whether the circumstances of the inadvertent disclosure warrant a finding that the privilege has been waived. See, *e.g., Alldread v. City of Grenada,* 988 F.2d 1425, 1434 (5th Cir.1993); *Bud Antle, Inc. v. Grow–Tech. Inc.,* 131 F.R.D. 179, 183 (N.D.Cal.1990); *Parkway Gallery,* 116 F.R.D. at 50; *Hartford Fire Ins. Co. v. Garvey,* 109 F.R.D. 323, 332 (N.D.Cal.1985) (work product privilege). These courts have generally considered five factors to be important in deciding whether the privilege has been waived as to a particular communication: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery: (4) the extent of the disclosure; and (5) the "overriding issue of fairness." *E.g., Bud Antle,* 131 F.R.D. at 183. See also *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.,* 132 F.R.D. 204, 208–09 (N.D.Ind.1990) (reviewing case law and rejecting subjective standard requiring intentional disclosure for waiver).[1]

---

**1.** These factors are generally traced to *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985), although the court there appears to have applied the subjective test of the disclosing party's intention, and used the listed factors as evidence as to whether the disclosure was "a knowing waiver or simply a mistake, immediately recognized and rectified." *Id.* After finding the disclosure was inadvertent, the *Lois Sportswear* court found no waiver because there was no intent to waive the privilege. Nevertheless, courts that have reject-

■ This court will not follow the approach requiring an examination of the subjective intentions of the disclosing party. The courts should not need to devote such efforts to protect clients from their own errors or those of their counsel. Judge Dillin followed the balancing approach in *In re Recombinant DNA.* Magistrate Judge Cosbey of the Northern District of Indiana rejected the subjective approach in *Golden Valley Microwave Foods,* but did not need to choose between the strict accountability approach and the balancing approach. See 132 F.R.D. at 209. Similarly, this court need not choose in this case between the strict accountability approach and the balancing approach because both approaches produce the same result here. Under the strict accountability approach, the Dickerson letter is no longer privileged simply because it has been disclosed to persons who have no obligation to maintain confidentiality. The court will explain its consideration of the factors usually identified in the balancing approach, although the court believes that in cases of actual (as opposed to constructive) disclosure to the direct opponent (as opposed to some other person), the distinction between the strict accountability approach and the balancing approach has little practical significance.

**Reasonableness of Precautions:** It is difficult for a party to show that it took reasonable precautions to prevent production of privileged documents where those precautions obviously failed. See *International Digital Sys.,* 120 F.R.D. at 449. Defendants here have not shown that they took reasonable precautions. Defense counsel's second affidavit is the only source of information about the procedures that were used to screen documents before production. He testifies that both he and a paralegal reviewed the documents to be produced before they were actually produced to plaintiff's counsel. He also notes that defendants prepared a log of privileged documents and listed the Dickerson letter on that log. The record here does not indicate any substantial time pressure during the document production process. The production occurred near-

ly two years after the first document request was served, far more than the presumptive thirty days permitted by the Federal Rules of Civil Procedure. Defendants had ample time to take measures to prevent production of privileged documents. Most important, the privileged character of the Dickerson letter is as open and obvious as can be imagined. On its face, the letter is on law office letterhead, from the primary lawyer involved in the Draus matter, addressed to the hospital's board of trustees. And just in case all those clues were overlooked, the first page bears the underlined, all-capitals, boldface warning: "PRIVILEGED AND CONFIDENTIAL/ATTORNEY–CLIENT PRIVILEGED." Under these circumstances, even keeping in mind the deceptive clarity of hindsight, the thing speaks for itself. In the absence of any extenuating circumstances such as extraordinary time pressure, production of a document like this one to opposing counsel in litigation shows that the steps taken to avoid inadvertent production were not reasonable.

**Time Taken to Rectify the Error:** The defendants identified their error quickly. They demanded return of the Dickerson letter the day after it was produced. This is not a case where the producing party allowed its error to go uncorrected for weeks, months, or longer, or allowed the opponent to use the document in discovery without putting the opponent on notice of the claim of privilege. Cf. *In re Recombinant DNA,* slip op. at 11 (privileged documents had been used by receiving party in depositions for two weeks before error was identified).

**Scope of Discovery:** This factor is closely related to, and may well collapse into, the first. The document production at issue here involved about 2,400 pages in ten binders. That may seem like quite a bit of paper to those not familiar with modern litigation, but it is by no means a huge volume. It is certainly not so much paper that it is unreasonable to expect counsel or trained legal assistants to eyeball each document before producing it to opposing counsel. Defen-

ed the subjective approach and followed the balancing approach have used those same factors to determine whether waiver should be found.

dants here say that both a lawyer and a trained paralegal "reviewed" these documents before production for the purpose of removing privileged documents; they did not find this one.[2]

**Extent of Disclosure:** Here the disclosure involved only one document, but the disclosure of that document was utterly complete, and it was made to the opposing party most interested in the contents of the document. This is not a case where the inadvertent disclosure at issue was made to a third party. Cf. *In re Sealed Case*, 877 F.2d at 977, 980 (disclosure to separate government agency in separate proceeding). Nor is this a case where the disclosure was minimal or constructive, as when someone might glance in an open file or designate a document for copying before reading it. Cf. *Parkway Gallery*, 116 F.R.D. at 51–52 (merely glancing in a file or designating documents for copying might not justify finding of waiver when essence of document's contents not yet disclosed); *Chubb Integrated Sys. Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 63 (D.D.C.1984) (mere fact that opponents had opportunity to open file drawer cannot constitute disclosure sufficient for waiver; document is disclosed when opponent learns "gist" of the contents); *Ranney–Brown Distrib., Inc. v. E.T. Barwick Indus., Inc.*, 75 F.R.D. 3, 6 (S.D.Ohio 1977) (distinguishing between complete disclosure of contents and situations where contents are not known). In this case the letter was produced to opposing counsel who read it before defendants demanded its return. The disclosure of the Dickerson letter is a bell that has already been rung. The court cannot unring it by ordering that copies be returned to defendants. See *Bud Antle*, 131 F.R.D. at 183–84 (privileged letter fully disclosed when counsel read it and took notes).

Three of these four factors point toward waiver of the attorney-client privilege here. The precautions taken were not reasonable, the scope of discovery was reasonably limited, and the extent of the disclosure was essentially complete as to the document involved. The only factor weighing against waiver is that after the disclosure occurred, defendants moved quickly to try to correct the error. Under these circumstances, the balance tips decidedly in favor of a finding of waiver. See *Parkway Gallery*, 116 F.R.D. at 51 (finding waiver where quick effort to rectify error was only factor weighing against finding of waiver); *Hartford Fire Ins.*, 109 F.R.D. at 332 (finding waiver of work product privilege in similar circumstances).

As a practical matter, the balancing approach and the strict accountability approach will nearly always produce the same result—a finding of waiver—where there has been an actual (not constructive) disclosure of the "gist" of the communication to the opponent interested in the communication. These are the cases where the bell cannot be unrung and, absent unusual circumstances (such as court-compelled expedited discovery with a court's promise that inadvertent disclosure will not result in waiver), such actual disclosure to the opponent should result in a finding of waiver. See, *e.g., Alldread*, 988 F.2d at 1433–34; *F.D.I.C. v. Singh*, 140 F.R.D. at 253; *Golden Valley*, 132 F.R.D. at 209; *Bud Antle*, 131 F.R.D. at 183–84; *Parkway Gallery*, 116 F.R.D. at 50–52.

**The "Overriding Issue of Fairness":** If the court had any doubts about finding waiver based on the first four factors, the "overriding issue of fairness" would resolve such doubts in favor of a finding of waiver here. The Dickerson letter is relevant to some of the core issues in this case, including the fairness of the hospital's "fair hearing" procedures and the relationship among the defendants. Plaintiff describes the document as a "smoking gun." While plaintiff's assessment may be overstated, the letter is certainly highly relevant. It appears to contradict directly several of defendants' contentions that are central to their motion for summary judgment.

---

**2.** See *In re Recombinant DNA*, slip op. at 11–12 (finding waiver where party reviewed 50,000 pages and produced 12,000 pages under no significant time pressure); cf. *Transamerica Computer Co. v. International Bus. Mach. Corp.*, 573 F.2d 646, 649–51 (9th Cir.1978) (no waiver of privilege where court in prior related action required production of 17 million pages in three months and had overruled objections to procedure in part by assuring parties that inadvertent disclosure would not be deemed a waiver of privilege).

In evaluating the "overriding issue of fairness," the court must consider the following scenario at trial if defendants' motion were granted. Defendants would present evidence to the jury on some of these issues, asserting, for example, that the board's review of the Draus case was based on the information presented in the hearing, without the board having made up its collective mind before the hearing. Plaintiff would then seek to use the Dickerson letter to contradict the defendants' evidence. The court, the plaintiff, the defendants, and counsel would all know of the contradiction between the defendants' evidence and the Dickerson letter. Defendants would then ask the court to prohibit plaintiffs from even mentioning the Dickerson letter or its contents, let alone from sharing it with the jury. In the wake of a complete disclosure of the privileged document to the opposing party, resulting from the defendants' failure to take reasonable steps to protect the privilege, defendants would be asking the court to rescue the defendants from a serious error of their own making by joining in what would be tantamount to deception of the jury. Of course, the attorney-client privilege is so basic to our judicial system that it can be used to prevent disclosure of highly probative and damaging evidence. But the powerful policies that support the privilege are undermined after complete disclosure of the privileged communication to opposing counsel.

Accordingly, defendants' motion to compel return of the Dickerson letter is denied. That conclusion still leaves a question about the scope of the waiver. Intentional waiver of the attorney-client privilege usually results in waiver as to the entire subject matter addressed in the communication that is disclosed. However, courts finding that the inadvertent disclosure of a privileged document caused a waiver have generally found that the scope of the waiver is limited to the contents of the document that was disclosed. See, e.g., *Prudential Ins. Co. v. Turner & Newall, PLC,* 137 F.R.D. 178, 182–83 (D.Mass.1991); *International Digital Sys.,* 120 F.R.D. at 446 n. 1; *Parkway Gallery,* 116 F.R.D. at 52. But see *In re Sealed Case,* 877 F.2d at 981 (inadvertent disclosure of privileged documents waived privilege as to "all other communications relating to the same subject matter," and remanding for further review of scope of the relevant "subject matter"). While that rule is not universal or rigid, the court sees no reason to find any broader waiver in this case.

## II. PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiff has filed a separate motion to compel production of a number of documents as to which defendants have asserted attorney-client or work product privileges. The documents are listed on Exhibit B to plaintiff's memorandum in support of his motion, docket no. 87. The listed documents include Dickerson's drafts of board minutes and numerous letters and memoranda relating to the Draus matter. Plaintiff also seeks to compel production of documents reflecting communications between Dickerson and attorneys for American Medtrust, Inc., the buyer of the hospital, during 1992. These documents are listed in Exhibit C of plaintiff's memorandum. In response to plaintiff's motion to compel, defendants have provided a more complete description of some of the documents (docket no. 185) and have submitted copies of the documents for *in camera* inspection by the court. From the combination of the descriptions and the *in camera* examination of the documents, it is possible to rule on the defendants' claims of attorney-client and work product privilege.

Most of the documents at issue are clearly privileged documents from Dickerson's files. They are either her attorney work product in the context of reasonably anticipated litigation with Dr. Draus or they are attorney-client communications to hospital management, including Tamar, concerning various matters related to the Draus investigation. There are several clusters of documents that present specific issues.

**1992 Communications between American Medtrust, Inc. and Healthtrust:** After the hospital imposed limitations on Dr. Draus's privileges, the hospital sent three reports to the National Practitioners Data Bank administered by the federal govern-

ment. Control of the hospital changed from Healthtrust to American Medtrust, Inc. effective January 1, 1992. After that date, Dr. Draus lodged protests with the Data Bank concerning the reports. The Data Bank turned to the hospital, by then under control of American Medtrust, for response. American Medtrust understandably turned to Healthtrust for information and some guidance. Attorneys for the two companies communicated with one another concerning the response to those protests, and non-lawyer executives of both companies were advised of the circumstances. Defendants assert that these communications are protected by the attorney-client and/or work product privileges as they apply where two separate clients share a community of interest with respect to potential litigation.

The Seventh Circuit and many other federal courts have recognized that the attorney-client and work product privileges may extend to communications among persons who share a joint legal interest in the subject matter of the communications. See *United States v. McPartlin,* 595 F.2d 1321, 1336 (7th Cir.1979); *Anderson v. Torrington Co.,* 120 F.R.D. 82, 86 (N.D.Ind.1987); *Schachar v. American Academy of Ophthalmology, Inc.,* 106 F.R.D. 187, 191 (N.D.Ill.1985); *Western Fuels Ass'n, Inc. v. Burlington Northern R.R. Co.,* 102 F.R.D. 201, 203 (D.Wyo.1984); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 512–14 (D.Conn.1976). One relatively early description of this "community of interest" doctrine stated:

A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest may be distinct legal entities from the client receiving the legal advice and may be a non-party to any anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.

*Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1172 (D.S.C.1974). The reasoning in these cases has been applied to potential, as well as pending, litigation. *In re LTV Securities Litig.,* 89 F.R.D. 595, 604 (N.D.Tex.1981).

In this case, where state law provides the rules of decision, state law also governs the rules of privilege. Fed.R.Evid. 501. Indiana courts appear to recognize the extension of the attorney-client and work product privileges to communications within a group with a community of legal interest in the context of potential litigation. *Corll v. Edward D. Jones & Co.,* 646 N.E.2d 721, 725 (Ind.App. 1995) (holding privilege applied to attorneys' meeting with group of prospective plaintiffs in class action; all met to discuss "a matter of joint concern and were present to further a common interest" even though not all participants in meeting agreed to pursue litigation). In the absence of more specific guidance from the Indiana courts, *Corll* shows that the Indiana courts would probably apply the community of interest doctrine in a way consistent with the above cited federal decisions.

■ At least by the time the disputed communications took place in 1992, the buyer and seller of the hospital had a community of interest concerning the reports sent to the National Practitioner Data Bank concerning Dr. Draus. American Medtrust, the buyer of the hospital, was the party who needed to respond to the Data Bank's inquiries and Dr. Draus's objections to the reports, but the reports had been submitted by the hospital while it was still under the control of Healthtrust, whose lawyers and personnel were most familiar with the situation. American Medtrust turned to Healthtrust for background information and advice concerning those responses. In addition, the prospect of potential litigation with Dr. Draus was quite clear by the time these communications occurred. The two entities had a community of interest with respect to the subject matter of these communications, which are listed on "Exhibit C" to docket no. 87. Plaintiff's mo-

tion to compel production is denied with respect to these documents.

■ Communications with Hearing Committee Attorney: Plaintiff seeks production of a letter dated August 30, 1991, from Dickerson to John Vissing, an attorney who was hired by the hospital to represent the Hearing Committee in the Draus matter. (Doc. nos.101169CD–101171CD) The letter begins by thanking Vissing for agreeing to represent the Hearing Committee and goes on to provide additional background information about the relevant law and facts. Defendants assert that Dickerson had represented the Hearing Committee up to that point by virtue of her representation of the hospital and related entities. Defendants conclude that her letter to Vissing is therefore protected by the attorney-client privilege. Plaintiffs argue that the letter is not privileged but is merely an *ex parte* communication by one advocate to a lawyer for an independent decision-making body for the hospital.

Whether this communication was privileged depends on the relationship between the hospital and the Hearing Committee. Defendants point out that the Hearing Committee was acting as an agent of the hospital, just as Dickerson was acting as an attorney and agent for the hospital. In addition, she directed Vissing to submit his bills to her for forwarding to Healthtrust for payment. However, in view of the special role that the Hearing Committee played in the hospital's supervision of its medical staff and its members' privileges, it is not really accurate to say that a communication between the hospital's attorney and the Hearing Committee's attorney is privileged merely by virtue of the fact that both were agents for the hospital. Under the Fair Hearing Plan in the bylaws, the Hearing Committee presides over an adversary hearing in which opposing parties, who may be represented by counsel, present evidence, cross-examine witness, and argue their cases on the record to the committee.

The committee is then expected to render a fair decision based on the evidence and arguments it has heard. See, *e.g.*, Draus App. 19 to memorandum in opposition to defendants' motion for summary judgment at 102018CD, 102021CD–102024CD, 102031CD. The Hearing Committee had its own lawyer because Dickerson was going to be involved in the hearing on behalf of one side.

The situation is analogous to administrative agencies that employ both administrative law judges and attorneys who represent the agency in enforcement actions in hearings before those administrative law judges. Although both are, in a general sense, employees and agents of the state or federal agency, *ex parte* communications between them on the substance of a contested matter usually are not considered even proper, let alone protected by the attorney-client privilege. See. *e.g.*, 5 U.S.C. § 554(d) (prohibiting *ex parte* contacts between "prosecuting" attorney and decisionmaker in federal agency adjudication); *Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1424 (9th Cir.1994) (finding no due process violation where attorneys prosecuting administrative action were prohibited from *ex parte* communication with decisionmaker in same agency); *Doe v. Hampton*, 566 F.2d 265, 276 (D.C.Cir.1977) (in general, *ex parte* communications by adversary party to decisionmaker in adjudicatory proceeding are prohibited by due process requirements). In this case, of course, the requirements of fairness are based in a private contract rather than in a federal statute or the Constitution, but the parallel is useful at least to the extent of considering the privilege claim here. There is no reason the courts should recognize an attorney-client relationship between counsel for one of the "parties" to the proceeding and the committee itself. Plaintiff's motion to compel Is granted with respect to the Dickerson letter to Vissing.[3]

---

3. Defendants argue that the Indiana Court of Appeals has approved of having a hospital's "prosecuting" attorney also act as counsel for a hearing committee. See *Stiller v. LaPorte Hosp., Inc.*, 570 N.E.2d 99, 107 (Ind.App.1991). However, even if such an arrangement is permissible, where a hearing committee has obtained its own counsel and will hear from two sides in an adversarial hearing, the reasoning in *Stiller* does not extend so far as to throw a cloak of attorney-client privilege over *ex parte* communications between a "prosecuting" attorney and the committee's separate attorney.

 **Asset Purchase Agreement for the Hospital:** Defendants have also refused to produce document nos. 101687CD–101739CD. The first page is a March 23, 1992, cover letter from Ernest E. Hyne, II, an attorney for Healthtrust, to Dickerson; attached to that letter is a copy of the Asset Purchase Agreement between American Medtrust, Inc., HTI Health Services of Indiana, Inc., and Healthtrust, Inc.—The Hospital Company, dated November 15, 1991. Defendants have asserted that the letter is an attorney-client communication and that the attached pages are "confidential business records." The cover letter is protected by the attorney-client privilege. The attached agreement is not. It also contains several provisions that refer specifically to Dr. Draus. Plaintiff's motion to compel is granted with respect to document nos. 101688CD–101739CD.

**Miscellaneous Documents:** The documents submitted include two otherwise unprivileged documents that contain privileged notations by attorneys. These documents are nos. 100852CD–00854CD. If these documents have not been produced yet, they shall be produced in a redacted form to exclude production of privileged notes. In addition, document no. 101271CD is not privileged but was attached to privileged documents. If this memorandum has not been produced in some other form, it shall also be produced.

### CONCLUSION

For the reasons set forth above, defendants' motion to compel return of the Dickerson letter dated November 18, 1991, is hereby DENIED. Plaintiff's motion to compel production of documents is hereby GRANTED with respect to document nos. 101169CD–101171CD and 101688CD–101739CD. Defendants shall produce these documents to plaintiff for inspection and copying no later than 21 days from the date of this entry. In addition, if defendants have not produced unprivileged copies of document nos. 100852CD–100854CD, they shall produce redacted copies to plaintiff for inspection and copying no later than 21 days from the date of this entry. If document no.

101271CD has not been produced, it shall be produced to plaintiff for inspection and copying no later than 21 days from the date of this entry. In all other respects, plaintiff's motion to compel production of documents is hereby DENIED. The court will make no award of attorneys' fees or costs with respect to these motions.

So ordered.